**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| TENNESSEE RIVERKEEPER, INC.,<br><br>Plaintiff,<br><br>v.<br><br>TOWN OF ALEXANDRIA,<br><br>Defendant. | No. 2:26-cv-00032<br><br>Hon. Waverly D. Crenshaw, Jr.<br>Hon. Luke A. Evans |

## MOTION AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

Congress's enactment of 33 U.S.C. § 1365—the statute under which Plaintiff pursues this case—upsets the balance struck by the U.S. Constitution's Framers. In 1787, they vested the executive power in a President and established Executive Branch unity by giving the President the power to appoint, oversee, and remove subordinates. The Framers feared that a plural executive would lead to second-guessing of the President's decisions. Although the Framers chose this arrangement, Congress in 1972 shattered Executive Branch unity with Clean Water Act ("CWA") citizen suits, which allow additional actors to exercise executive power. And that is what happened here: despite being notified of the alleged violations in January 2026, the President's subordinates did not bring an enforcement action. That should have been the end of the story. But because Congress undermined the President's prerogatives, Plaintiff—who thinks it knows better than the President, Department of Justice ("DOJ"), and U.S. Environmental Protection Agency ("EPA")—was allowed to bring the very claims the Executive declined to pursue. This is not an isolated incident for Plaintiff, as this is the thirty-first CWA citizen suit it has filed since 2010.

This vitiating of the President's enforcement decisions threatens the accountability our Framers sought to ensure. The vesting of all executive power in a democratically accountable

government official was just as much a part of Article II's design as the vesting of that power in one individual. Under this structure, private and unaccountable plaintiffs may not seek public remedies, which is what Plaintiff pursues here. Because Plaintiff wields executive power, this triggers the private nondelegation doctrine, which protects Executive Branch unity by forbidding private individuals from wielding government power and by limiting their role to giving advice, assistance, and recommendations to an agency with authority and surveillance over them. Plaintiff cannot meet this test, and its citizen suit violates this doctrine. And because Congress has allowed Plaintiff to wield executive power to bring a lawsuit that the Executive declined to pursue, Congress has interfered with the President's ability to employ prosecutorial discretion and thereby violated the Executive Vesting and Take Care Clauses. Finally, this lawsuit violates the Appointments Clause. Thus, the Court should dismiss the Second Amended Complaint ("SAC").

## STATEMENT OF FACTS & PROCEDURAL HISTORY

The Town of Alexandria ("Defendant") owns and operates a sewage treatment plant ("STP"), for which it obtained National Pollutant Discharge Elimination System Permit No. TN0021539 (the "NPDES Permit"), which allows it to discharge treated wastewater to Hickman Creek, "subject to stated discharge limitations." *See* SAC ¶¶ 18, 58. Hickman Creek is a tributary of Caney Fork, which is a tributary of Cumberland River. *Id.* ¶ 31. On January 23, 2026, Plaintiff sent a Notice of Intent to Sue Letter to Alexandria, the EPA Administrator, and the Commissioner of the Tennessee Department of Environment and Conservation threatening to sue Alexandria and alleging that it was violating the CWA by violating its NPDES Permit. *Id.* ¶ 6; ECF Doc. 29-1.

Plaintiff alleges that some of its members "have recreated in, on or near, or otherwise used and enjoyed, or attempted to use and enjoy, Hickman Creek, Caney Fork and Cumberland River in the past, and they intend to do so in the future." SAC ¶ 12. They allegedly "would recreate more

in and around Hickman Creek, Caney Fork and Cumberland River but for Defendant's [alleged] NPDES permit violations." *Id.* ¶ 13. A member of Plaintiff, Petrus Snijders, declares that he has a guide service, pursuant to which he takes clients "on the Harpeth River, Buffalo River, Caney Fork, Percy Priest, Old Hickory Lake, [and] the Cumberland River," but not on Hickman Creek. ECF Doc. 29-2 ¶ 5; *see* SAC ¶ 15. He allegedly "enjoy[s] fishing in Caney Fork." ECF Doc. 29-2 ¶ 6; *see* SAC ¶ 15. Another member, Kevin Key, declares that he "manages land on Hickman Creek" "owned by his children" "one mile downstream of the Alexandria STP." SAC ¶ 16; *see* ECF Doc. 29-3 at 2. He used to fish "for bream in Hickman Creek but" stopped "several years ago due to the algae" in the creek, which he attributes to nitrogen and phosphorous from the STP. SAC ¶ 16; *see* ECF Doc. 29-3 at 3. He is vaguely "concerned about," but does not allege any harms or changes in behavior due to "other pollutants [allegedly] released, such as suspended solids, total suspended solids, biological oxygen demand (BOD) and E.coli." SAC ¶ 16; *see* ECF Doc. 29-3 at 3.

EPA did not initiate a CWA lawsuit against Alexandria prior to May 22, 2026. *See* SAC ¶ 7. Although the "State of Tennessee commenced an administrative action under state law by issuing an order on March 17, 2026," it too did not initiate a CWA lawsuit against Alexandria prior to May 22, 2026. *Id.* ¶¶ 7-8. On that date, Plaintiff filed its CWA citizen suit Complaint, praying for declaratory and injunctive relief and the assessment of a $74,958.04 civil penalty per day, per violation against Defendant, and seeking its costs and attorney's fees. *See* ECF Doc. 1 Prayer for Relief. On July 28, 2026, Defendant filed a Motion to Dismiss, arguing that the Complaint failed to state a claim for relief because the CWA's citizen suit provision, 33 U.S.C. § 1365, violates the U.S. Constitution's separation of powers. *See* ECF Doc. 14. This Motion was the third time in eight months that Plaintiff had been confronted with this constitutional argument. *See Tenn. Riverkeeper, Inc. v. City of Springfield*, No. 3:26-cv-284, ECF Doc. 14 (M.D. Tenn. June 15, 2026);

*Tenn. Riverkeeper, Inc. v. City of Luttrell*, No. 3:25-cv-541, ECF Doc. 18 (E.D. Tenn. Dec. 5, 2025). On each prior occasion, rather than litigating the issue, Plaintiff voluntarily dismissed its complaint pursuant to Fed. R. Civ. P. 41. *Springfield*, ECF Doc. 35 (Aug. 21, 2026); *Luttrell*, ECF Doc. 22 (Dec. 18, 2025). In this case, however, Plaintiff has taken a different tack.

On September 9, 2026, Plaintiff filed its Motion for Leave to Amend the Complaint. *See* ECF Doc. 21. The express purpose of this motion was to "address the constitutional challenges . . . which may deem the Motion to Dismiss unnecessary." *Id.* ¶ 3. Plaintiff attempted to plead around the constitutional argument by dropping its request for an assessment of civil penalties from its Prayer for Relief. *Compare* ECF Doc. 1 Prayer for Relief ¶ (c) (Complaint), *with* ECF Doc. 24 Prayer for Relief (Amended Complaint). On September 11, the Court granted Plaintiff leave to amend its Complaint. *See* ECF Doc. 22. However, three paragraphs of the Amended Complaint still expressly alleged that Plaintiff continued to pursue civil penalties. *See* ECF Doc. 24 ¶¶ 3, 56, 65. Therefore, on October 20, Plaintiff filed its Motion for Leave to File Second Amended Complaint, which sought to delete these paragraphs. *See* ECF Doc. 27 ¶¶ 3(a), (d), (f). On October 22, the Court granted this motion, and on the same day, Plaintiff filed its two-count SAC. *See* ECF Docs. 28-29. Count I alleges that Alexandria violated its NPDES Permit by "discharg[ing] pollutants to the waters of the United States and waters of the state in excess of the permit limitations." *See* SAC ¶ 63. Count II brings a claim for Injunctive Relief.

**<u>LEGAL STANDARD</u>**

A Rule 12(b)(6) motion to dismiss should be granted where the complaint lacks "factual allegation[s] sufficient to plausibly suggest" a claim's elements. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-83 (2009). An argument attacking the constitutionality of a statute may be made through a motion to dismiss. *See United States v. Morrison*, 529 U.S. 598, 604 (2000).

## LEGAL ARGUMENT– 33 U.S.C. § 1365 VIOLATES THE SEPARATION OF POWERS

### I. Plaintiff Is Exercising the Executive Power

#### A. Despite Plaintiff's Attempt to Remove Its Request for Civil Penalties from the SAC, Civil Penalties – Which Constitute Executive Power – Remain Part of This Case

Plaintiff's removal of its request for civil penalties from the SAC does not eliminate civil penalties from the action. Plaintiff's attempt to drop its request for civil penalties is based on a misunderstanding of how the CWA's citizen suit provision works. That provision provides "Authorization" for "any citizen [to] commence a civil action" and grants "district courts . . . jurisdiction . . . to enforce such an effluent standard or limitation . . . and to apply any appropriate civil penalties under section 1319(d) of this title." 33 U.S.C. § 1365(a). Section 1319(d), in turn, states: "Any person who violates . . . any permit condition" of the CWA "*shall be subject* to a civil penalty not to exceed $25,000 per day for each violation." *Id.* § 1319(d) (emphasis added). Every circuit court that has considered the issue has held that civil penalties are mandatory under § 1365(a). *NRDC v. Texaco Refining & Marketing, Inc.*, 2 F.3d 493, 503 (3d Cir. 1993) ("This mandatory language demonstrates that once a citizen plaintiff establishes an ongoing violation of a parameter at the time the complaint is filed, the court is obliged to assess penalties for all proven violations of that parameter." (citations omitted)); *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir. 1990) ("This language makes clear that once a violation has been established, some form of penalty is required."); *Stoddard v. W. Carolina Reg'l Sewer Auth.*, 784 F.2d 1200, 1208 (4th Cir. 1986) ("[A] penalty in some form is mandated."); *see also Leslie Salt Co. v. United States*, 55 F.3d 1388, 1397 (9th Cir. 1995) ("We agree with the other circuits that have held that civil penalties are mandatory under section 309(d).").[1] Thus, regardless of

---

[1] Relatedly, the Supreme Court has held that, because civil penalties and injunctive relief "are referred to in the same subsection, even in the same sentence" of the CWA's citizen suit provision,

whether the SAC contains a request for civil penalties, should this Court "declar[e] that Defendant Alexandria has violated and is in violation [of] the CWA," *see* SAC Prayer for Relief ¶ (a), "some form of penalty is required." *Atl. States*, 897 F.2d at 1142. For these reasons, civil penalties remain a part of this case.

And because such penalties remain part of this case, § 1365(a) unconstitutionally vests executive power in Plaintiff by allowing it to pursue civil penalties payable to the U.S. Treasury. The Framers vested "the 'executive Power'—all of it—. . . 'in a President,'" and the pursuit of "daunting monetary penalties against private parties on behalf of the United States in federal court [is] a quintessentially executive power." *Seila Law LLC v. CFPB*, 591 U.S. 197, 203, 219 (2020) (citation omitted); *see also Trump v. Slaughter*, 609 U.S. 422, 455 & n.4 (2026); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring). Because Plaintiff's action necessarily seeks civil penalties payable to the U.S. Treasury of almost $75,000 per day, per violation, Plaintiff exercises executive power. *See* ECF Doc. 1 Prayer for Relief ¶ (c); *see supra* pp. 5-6; *see also* Baron de Montesquieu, *The Spirit of the Laws* Pt. 2, Bk. 11, Ch. 6, p. 157 (Anne M. Cohler, Basia C. Miller & Harold S. Stone eds. 1989) (1748) ("the executive power" includes the power by which the magistrate "punishes"); John Locke, *Second Treatise on Government* §§ 7, 13, pp. 9, 12 (East India Publishing Co. ed. 2023) (1689) ("the executive power" includes the "right to punish the transgressors").[2]

---

this drafting choice "suggests a connection between injunctive relief and civil penalties." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 58 (1987) (citing 33 U.S.C. § 1365(a)). Accordingly, when a CWA citizen suit is brought, civil penalties remain "connect[ed]" to the request for injunctive relief—meaning civil penalties cannot be dropped.

[2] As *Seila Law* already settled this issue, based on precedent alone, this Court can hold Plaintiff's pursuit of civil penalties is an exercise of executive power. Besides the argument from precedent, an analysis of original public meaning of "the executive power" points to the same conclusion. *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1134 (11th Cir. 2021) (Newsom, J., concurring).

Were there any doubt that the pursuit of civil penalties payable to the U.S. Treasury constitutes executive power, Plaintiff put this to rest by attempting to drop its prayer for civil penalties. *See supra* p. 4. The purpose of Plaintiff's Motion for Leave to Amend was to "address the constitutional challenges" in Defendant's Motion to Dismiss. ECF Doc. 21 ¶ 3. That Motion argued that Plaintiff's pursuit of civil penalties constitutes executive power, *see* ECF Doc. 14 at 6-7, and Plaintiff "address[ed]" this argument by attempting to drop this requested relief. ECF Doc. 21 ¶ 3. This is an admission that the pursuit of civil penalties is an exercise of executive power.

### B. Even if Civil Penalties Are No Longer Part of This Case, the Remainder of Plaintiff's § 1365 Claim Constitutes an Exercise of the Executive Power

Even if the Court holds that Plaintiff's amendment of the pleadings precludes the levying of civil penalties, Plaintiff's § 1365 claim for declaratory[3] and injunctive relief constitutes an exercise of executive power. Through the remainder of its claim, Plaintiff exercises executive power by "conducting civil litigation in the courts of the United States for vindicating public rights[.]" *Buckley v. Valeo*, 424 U.S. 1, 140 (1976) (per curiam); *see also Slaughter*, 609 U.S. at 455-56 ("[T]he 'discretionary power to seek judicial relief' lies at the very core of executive authority." (quoting *id.* at 138)). There is a distinction between injured parties seeking reparation for private wrongs and suits that seek to redress "a wrong to the public," not just "a wrong to the individual." *Huntington v. Attrill*, 146 U.S. 657, 668 (1892). This distinction is rooted in "the familiar classification of Blackstone: 'Wrongs are divisible into two sorts or species: private wrongs and public wrongs,'" *id.* (quoting 3 William Blackstone, *Commentaries on the Laws of England* *2), and rights are divided into private rights and public rights. *Ellingburg v. United States*, 607 U.S. 163, 179-80 (2026) (Thomas, J., concurring) (discussing Blackstone).

---

[3] Nowhere in its text does § 1365 allow for declaratory relief, and Defendant views this requested relief as necessarily bound up with Plaintiff's request for injunctive relief.

"[P]ublic rights" are those that involve duties owed "to the whole community, considered as a community, in its social aggregate capacity." 4 Blackstone, *supra*, at *5; *see Huntington*, 146 U.S. at 668 (citation omitted); *de Fontbrune v. Wofsy*, 838 F.3d 992, 1001 (9th Cir. 2016) (citation omitted). Public rights "include interests generally shared, such as . . . general compliance with regulatory law." Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 693 (2004) (footnote and citation omitted). A public wrong could be pursued only "at the suit of the king" for public remedies such as "fine and imprisonment." 4 Blackstone, *supra*, at *6. In contrast, private rights are those "'belonging to individuals, considered as individuals.'" *Huntington*, 146 U.S. at 668 (quoting 3 Blackstone, *supra*, at *2); *Wofsy*, 838 F.3d at 1001 (same). Such rights an individual can redress only by pursuing private remedies, which would "either restor[e] to him his right, if possible; or by giving him an equivalent" of "private compensation" through "civil satisfaction in damages." 4 Blackstone, *supra*, at *6-7; *see* Locke, *supra*, § 10, p. 10 ("a particular right to seek reparation from him that has done it").

The Sixth Circuit has confirmed that citizen suit plaintiffs sue to vindicate public rights because they "seek relief not on their own behalf but on behalf of society as a whole[.]" *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004) (citation omitted). Plaintiff is suing to redress alleged wrongs to public rights because it alleges harms to the "waters of the United States." SAC ¶ 3. Indeed, it admits that the only time the CWA applies is when the "waters of the United States" are implicated. *Id.* ¶ 20. There are alleged harms to three "waters," *id.* ¶ 66, none of which Plaintiff alleges an ownership interest in, as the only alleged "recreational, aesthetic, and environmental interests" are those the whole community shares. *Id.* ¶¶ 12-16.

If EPA brought such an enforcement action to remedy these alleged public wrongs, no one would deny it was exercising executive power. But whether executive power is being exercised

does not turn on the identity of the actor. Just as EPA would be exercising executive power through an enforcement action, so too is Plaintiff because citizen suits "are enforcement actions." *Glynn Envtl. Coal., Inc. v. Sea Island Acquisition, LLC*, 146 F.4th 1080, 1091 (11th Cir. 2025) (Pryor, C.J., concurring) (citation omitted). After all, citizen plaintiffs are understood "to step into the government's shoes." *StarLink Logistics, Inc. v. ACC, LLC*, 101 F.4th 431, 447 (6th Cir. 2024) (citation omitted); *see Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir. 1987) ("citizen plaintiffs effectively stand in the shoes of the EPA").

By way of analogy, the Federal Trade Commission and the Consumer Financial Protection Bureau, at issue in *Slaughter*, 609 U.S. at 455-56, and *Seila Law*, 591 U.S. at 206, respectively, could pursue injunctions through civil enforcement actions, and this was held to be executive power. Because citizen plaintiffs seek the same relief for public wrongs through enforcement actions, they too exercise executive power, as they seek to "[v]indicat[e] 'the *public* interest'" which "'is the function of Congress and the Chief Executive.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) (citation omitted); *see* 4 Blackstone, *supra*, at *2; Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 789. Vindicating the public interest is not the prerogative of private individuals, but Plaintiff attempts to do so here.

## II. Plaintiff's Exercise of Executive Power Violates the Private Nondelegation Doctrine

Congress's vesting of executive power in private plaintiffs, and Plaintiff's attempt to wield it here, violate the private nondelegation doctrine. *Oklahoma v. United States*, 163 F.4th 294, 305 (6th Cir. 2025) ("[T]he Vesting Clauses . . . bar unchecked reassignments of power to a non-federal entity."). This doctrine teaches that the Constitution's separation of powers forbids Congress to enact a law that "allows non-governmental entities to govern." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 697 (2025). In contrast, laws are permissible under which "private actors" provide only "advice and assistance" to "[g]overnment agencies" and "give [them] recommendations." *Id.* at

692. A government agency must "retain[] decision-making power" so that "the private party's recommendations . . . cannot go into effect without an agency's say-so[.]" *Id.* at 692, 695 (citation omitted). Further, private actors must "'function[] subordinately to' the agency" and be "subject to [the agency's] 'authority and surveillance.'" *Id.* at 692 (citation omitted).[4] Section 1365 violates this doctrine by allowing citizen plaintiffs to govern.

Section 1365 lets citizen plaintiffs govern by allowing them to exercise executive power. *See supra* pp. 5-9. Plaintiff exercised that power by filing its Complaint, Amended Complaint, and SAC without the Government's "say-so." *Consumers' Rsch.*, 606 U.S. at 695 (citation omitted). This violates the private nondelegation doctrine. Plaintiff did not advise the Government that the Government should file these complaints. Plaintiff did not give the Government assistance in filing these complaints. And it did not recommend that the Government file these complaints. *Id.* at 692. Instead, Plaintiff governed by making these filings without the Government's "say-so." *Id.* at 695. Thus, one cannot say the Government "alone has decision-making authority." *Id.* at 693.

Further, Plaintiff does not "'function[] subordinately to' [any] agency," as it is not "subject to [any agency's] 'authority and surveillance.'" *Id.* at 692 (citation omitted). To determine what authority the Executive Branch has over Plaintiff, the proper place to look is the pertinent statute, as an "agency 'literally has no power to act unless and until authorized by statute.'" *FCC v. AT&T, Inc.*, 608 U.S. 531, 541 (2026) (citation omitted) (cleaned up). The CWA gives the Executive Branch essentially no authority over Plaintiff. The only post-suit rights any officials have is that

[4] *See Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) ("[T]here is not even a fig leaf of constitutional justification" for allowing "private entities" to exercise "'executive Power,'" as "it raises '[d]ifficult and fundamental questions' about 'the delegation of Executive power' when Congress authorizes citizen suits." (second alteration in original) (citations omitted)); *Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) ("*Black I*").

"the plaintiff shall serve a copy of the complaint on the Attorney General and the Administrator," and, if the private plaintiff wants to settle, the Attorney General and Administrator are entitled to only a 45-day review period. 33 U.S.C. § 1365(c)(3). They lack final decision-making authority over the proposed consent judgment. This scheme inverts the way public and private entities are supposed to interact. To survive private nondelegation doctrine scrutiny, "the private party's recommendations . . . cannot go into effect without an agency's say-so[.]" *Consumers' Rsch.*, 606 U.S. at 695 (citation omitted). Here, however, if the private CWA plaintiff wants to settle, the Government can only make recommendations, with the private plaintiff retaining the final say.

Although the Administrator "may intervene as a matter of right," 33 U.S.C. § 1365(c)(2), this limited intervention right does not "allow the Administrator to unilaterally dismiss a citizen suit once he has intervened." *See NAACP v. X.AI Corp.*, --- F. Supp. 3d ----, 2026 WL 3124447, at *6 (N.D. Miss. Oct. 19, 2026) ("*X.AI I*") (discussing similar Clean Air Act ("CAA") intervention provision). This contrasts with the right Congress gave in the False Claims Act ("FCA") *qui tam* statute, another law that allows private plaintiffs (known as relators) to exercise executive power. 31 U.S.C. § 3730(b)(2), (c)(2)(A), (c)(3). That statute expressly gives the Government the ability to intervene and dismiss a *qui tam* action at any time over the relator's objection. *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424 (2023).[5] But with CWA citizen suits, the Executive Branch has no statutory authority to countermand Plaintiff's litigation decisions.

The CWA's "diligent prosecution bar" does not remedy the constitutional defects. That bar prevents a citizen plaintiff from suing "if the Administrator . . . has commenced and is diligently

---

[5] In this way, the constitutionality of § 1365 is even more suspect than the FCA *qui tam* statute. *Cf. Polansky*, 599 U.S. at 442 (Kavanaugh, J., joined by Barrett, J., concurring) (stating "'[t]here are substantial arguments that the *qui tam* device is inconsistent with Article II'" (citation omitted)); *id.* at 449 (Thomas, J., dissenting) (same).

prosecuting a" CWA action. 33 U.S.C. § 1365(b)(1)(B). But critically, the EPA Administrator has only "sixty days" to exercise this authority "after the plaintiff has given [the Administrator] notice." *Id.* § 1365(b)(1)(A). If the Government does not sue within sixty days, then the citizen plaintiff may file its complaint without the Government's say-so. And even when the Government sues within sixty days, "any citizen may intervene as a matter of right." *Id.* § 1365(b)(1)(B). Thus, the diligent prosecution bar does not effectively "bar" citizens from wielding executive power.

The argument against the constitutionality of the CWA's citizen suit provision is even stronger here than the analogous argument successfully advanced against the Financial Industry Regulatory Authority ("FINRA"). The D.C. Circuit preliminarily enjoined FINRA, a private entity, from expelling a member prior to Securities and Exchange Commission ("SEC") review because "SEC review can come only after, not before, the expulsion [from FINRA] takes effect," which would be "too little too late." *Alpine Secs. Corp. v. FINRA*, 121 F.4th 1314, 1326 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2751 (2025). But with the CWA, there is no supervisory role for any federal actor once the citizen suit is filed. *See X.AI I*, 2026 WL 3124447, at *5 ("EPA[] . . . does not . . . retain[] complete control over *all* Clean Air Act [citizen suit] litigation."). Thus, CWA citizen plaintiffs do not "*remain*[] 'subject to [the agency's] pervasive surveillance and authority' when it matters." *Oklahoma*, 163 F.4th at 314 (alteration in original) (emphasis added) (citation omitted).

Even opinions finding no private nondelegation doctrine violation underscore how far citizen suits are from satisfying this doctrine. The *Consumers' Research* Court upheld a delegation from the Federal Communications Commission ("FCC") to the private Universal Service Administrative Company, which serves as Administrator for the Universal Service Fund. Whereas "the Administrator is broadly subordinate to the" FCC because the "FCC appoints the Administrator's Board of Directors and approves its budget," here, Plaintiff self-appoints and

approves its own case budget. *Consumers' Rsch.*, 606 U.S. at 692-93 (citation omitted). Further, the "Administrator makes the initial projections" and "estimates the programs' cost," which the FCC reviews "and either revises or approves." *Id.* at 693-94. Thus, the FCC was the entity making the final decision. In contrast, citizen plaintiffs do not recommend how CWA suits should proceed and instead litigate cases independent of EPA's surveillance. "In every way that matters to the constitutional inquiry, [Plaintiff], not the [EPA], is in control." *Id.* at 695.

And although the Sixth Circuit rejected a facial nondelegation challenge to the Horseracing Integrity and Safety Act ("HISA"), it did so because HISA gives the Federal Trade Commission ("FTC") "'pervasive' oversight and control of the [Horseracing Integrity and Safety] Authority's enforcement activities[.]" *Oklahoma*, 163 F.4th at 312. For example, whenever the Authority proposes a sanction, an "aggrieved entity may obtain review from an Administrative Law Judge," and "[a]fter that, the FTC has full authority to review . . . [and] reverse any sanction by the Authority." *Id.* at 311 (citations omitted). Further, the "Authority's adjudication decisions do not become final until the FTC has the opportunity to review them," and if "the Authority tries to implement a sanction before the FTC finally reviews it, the FTC or the ALJ may stay the sanction." *Id.* (citations omitted). Also, HISA empowers the FTC to promulgate "rules constraining the Authority's investigations and increasing the procedural rights" and "to determine *who[m]* the Authority investigates." *Id.* at 312. Indeed, at the time *Oklahoma* was decided, there was a proposed "rule that would require the FTC's approval before the Authority may issue a subpoena or bring a civil enforcement action." *Id.* (citation omitted). There is nothing remotely similar here.[6]

[6] Enforcing the private nondelegation doctrine to dismiss Plaintiff's action also would further the rationale behind vesting the executive power in the sovereign alone. The Framers took the "sword out of private hands and turn[ed] it over to an organized government, acting on behalf of all the people." *Robertson v. U.S. ex rel. Watson*, 560 U.S. 272, 282-83 (2010) (Roberts, C.J., dissenting from dismissal of writ of certiorari); *see* 4 Blackstone, *supra*, at *7-8; Locke, *supra*, §§ 88-89, pp.

Further, this diffusion of executive power, and its vesting in citizen plaintiffs who are not accountable to the President, impairs the accountability the separation of powers was meant to secure. *Oklahoma*, 163 F.4th at 305 ("Transferring unchecked federal power to a private entity that is not elected, nominated, removable, or impeachable undercuts representative government at every turn."); *see also Ass'n of Am. R.R.s*, 575 U.S. at 57 (Alito, J., concurring); *Black I*, 53 F.4th at 880; Michael S. Greve, *The Private Enforcement of Environmental Law*, 65 Tul. L. Rev. 339, 391 (1990). Plaintiff does not merely give advice, assistance, and recommendations to EPA, it does not function subordinately to EPA, and it is not subject to EPA's authority and surveillance such that EPA retains decision-making power. *Consumers' Rsch.*, 606 U.S. at 692; *see also Alpine*, 121 F.4th at 1325; *Black I*, 53 F.4th at 889-90. For these reasons,[7] and because "'quintessentially executive' power may not be cleaved off from the Executive Branch," *Slaughter*, 609 U.S. at 456, the citizen suit provision and Plaintiff's lawsuit violate the private nondelegation doctrine.

## III. CWA Citizen Suits Violate the Executive Vesting and Take Care Clauses by Preventing the Executive Branch from Employing Prosecutorial Discretion

Congress's vesting of executive power in private plaintiffs impairs the President's ability to "[s]et[] prosecutorial priorities," which "lies within the President's Article II power." *Trump v.*

---

55-56. This was done to prevent self-interested, private individuals from using "the *power* of human punishment" for their own ends. 4 Blackstone, *supra*, at *7-8; *see Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (delegation to "private persons" was "delegation in its most obnoxious form" and unconstitutional because they were not "disinterested"); Locke, *supra*, § 90, p. 56. But with § 1365, Congress undid the Framers' design and placed the sword in private hands.

[7] Congress exacerbated the private delegation violation because § 1365 "also forecloses certain indirect methods of Presidential control" by allowing Plaintiff "receipt of funds outside the appropriations process." *Seila Law*, 591 U.S. at 225-26. "The President normally has the opportunity to recommend or veto spending bills that affect the operation of administrative agencies." *Id.* at 226 (citations omitted). Although "Presidents frequently use these budgetary tools 'to influence the policies of independent agencies,'" "no similar opportunity exists for the President to influence" plaintiffs' pursuit of citizen suits. *Id.* (citation omitted). For example, if EPA or DOJ exercises discretion contrary to his wishes, the President can limit their funding through a budget bill veto. Plaintiff, however, is immune from this pressure because it self-funds.

*California*, 609 U.S. 1032, 1037 (2026) (per curiam); *see also United States v. Texas*, 599 U.S. 670, 684 (2023); *id.* at 689 (Gorsuch, J., concurring in judgment). "The Presidential power of prosecutorial discretion is rooted in Article II," and "the President possesses a significant degree of prosecutorial discretion not to take enforcement actions against violators of a federal law." *In re Aiken Cnty.*, 725 F.3d 255, 262 (D.C. Cir. 2013) (Kavanaugh, J., concurring). The Framers imbedded this concept in Article II because they took to heart "Montesquieu's maxim" that, "[i]f the executive and legislative powers were united, the wielder of both powers would enact tyrannical laws and execute them tyrannically." Prakash, *supra*, at 798 (footnotes omitted). With "the executive Power" separated, however, "the executive could temper the effects of tyrannical laws with mild execution." *Id.* at 781 (footnote omitted); *see also* Locke, *supra*, § 11, p. 10-11.

The power of prosecutorial discretion extends to "an agency's decision not to prosecute or enforce, whether through civil or criminal process, [and] is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). This is because "an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Id.* at 832 (citation omitted); *see also Buckley*, 424 U.S. at 139. Indeed, "the choice of how to prioritize and how aggressively to pursue legal actions against defendants . . . falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).

Through CWA citizen suits, however, private plaintiffs (and their attorneys) vitiate prosecutorial discretion by choosing how to prioritize and how aggressively to pursue CWA actions against defendants. Indeed, the only time citizen suit plaintiffs can sue is when, after a 60-day waiting period, the Executive Branch does not prosecute the alleged CWA violation. *See* 33

U.S.C. § 1365(b)(l)(A). To be sure, the President may head off the citizen suit by having the Administrator commence a lawsuit, *see id.* § 1365(b)(1)(B), but this impinges on the President's power of prosecutorial discretion by forcing him to do the very thing he does not want done.

*Trump v. United States* confirms that Congress may not second-guess the Executive Branch's enforcement decisions. In that case, the Court held that "'the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law,'" and that this authority finds its source in the Take Care Clause. 603 U.S. 593, 620 (2024) (citations omitted). It also held that, "once it is determined that the President acted within the scope of his exclusive authority, his discretion in exercising such authority cannot be subject to further judicial examination." *Id.* at 608. All Justices agreed that "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." *Id.* at 609; *see id.* at 678 (Sotomayor, J., dissenting); *see also Slaughter*, 609 U.S. at 459. The CWA's citizen suit provision circumvents this prohibition by empowering private citizens to bring the very claims that the President declined to pursue. Thus, "'by concentrating power in a unilateral actor insulated from Presidential control,'" Congress breaks the executive chain of command by allowing unaccountable private parties to bring lawsuits that the Executive Branch has declined to pursue. *Collins v. Yellen*, 594 U.S. 220, 251 (2021) (citation omitted).

Moreover, by requiring this Court to impose civil penalties, *see supra* pp. 5-6, and "to enforce" the very "effluent standard or limitation" that the President has declined to enforce, *see* 33 U.S.C. § 1365(a), Congress worsened the Take Care Clause violation by "transfer[ring] from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 577 (1992)

(citation omitted). The Supreme Court has "always rejected" such a "vision of [its] role" that "would enable the courts . . . to become 'virtually continuing monitors of the wisdom and soundness of Executive action.'" *Id.* (citations omitted); *see Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) ("But federal courts do not exercise general oversight of the Executive Branch . . . ."). It has also recognized a distinction between "a mere ministerial duty, the performance of which might be judicially enforced," and a duty that is "purely executive and political." *Mississippi v. Johnson*, 71 U.S. 475, 498-99 (1866) (A ministerial duty "is one in respect to which nothing is left to discretion."). There are "general principles which forbid judicial interference with the exercise of Executive discretion," as any attempt by the Judiciary to control discretionary duties "might be justly characterized . . . as 'an absurd and excessive extravagance.'" *Id.* at 499. This is exactly what Congress forces the Judiciary to do through § 1365.

This subjects citizen suit defendants to a loss of "liberty as described by Locke"; liberty understood as "to be free from 'the inconstant, uncertain, unknown, arbitrary will of another man.'" *Ass'n of Am. R.R.s*, 575 U.S. at 75-76 (Thomas, J., concurring in judgment) (quoting John Locke, *Second Treatise of Civil Government* § 22, p. 13 (J. Gough ed. 1947)); *see also Seila Law*, 591 U.S. at 223-24. Prosecutorial discretion "protect[s] individual liberty by essentially under-enforcing federal statutes regulating private behavior." *Aiken Cnty.*, 725 F.3d at 264 (Kavanaugh, J., concurring). But because CWA citizen suits prevent the proper operation of Article II, any private plaintiff who disagrees with EPA's decision not to sue can bring suit and deprive a defendant of the liberty Article II sought to secure. As originally understood, the Executive Vesting Clause gives the President "the power to execute the laws," Prakash, *supra*, at 701, and the Supreme Court has repeatedly affirmed that this includes the President and his Executive Branch

subordinates' power to decline to bring lawsuits. *Texas*, 599 U.S. at 678; *Heckler*, 470 U.S. at 831-32. Congress undermined that prerogative with CWA citizen suits.

## IV. Congress Violated the Appointments Clause

The Appointments Clause by default requires the President to nominate and the Senate to confirm all "Officers of the United States," while allowing an exception for "inferior Officers" whose appointment Congress has "by Law vest[ed] . . . in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. One is an "officer" requiring appointment under the Clause when he (1) "'exercise[es] significant authority pursuant to the laws of the United States'"; and (2) "occup[ies] a 'continuing' position established by law." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (citations omitted).[8] The first prong is met by the prior sections on the Executive Vesting and Take Care Clauses. *See supra* pp. 5-9, 14-18 (discussing lawsuits seeking civil penalties and vindicating public rights). Courts also consider "significant authority" to exist when an actor "'exercise[s] significant discretion,'" *Lucia*, 585 U.S. at 245, 247-48 (citation omitted), which occurs here because Plaintiffs "possess[] authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" *Texas*, 599 U.S. at 678 (citations omitted).

These powers distinguish CWA citizen suits from *United States ex rel. Taxpayers Against Fraud v. General Electric Co.*, where the Sixth Circuit rejected an Appointments Clause challenge to the FCA's *qui tam* provision. 41 F.3d 1032, 1041 (6th Cir. 1994) ("[T]he relator is not vested with governmental power."). Further, the Sixth Circuit upheld the FCA's *qui tam* provision in part

---

[8] There is debate over whether the Appointments Clause applies to those who are not part of the Government and whether Appointments Clause challenges to non-governmental individuals or entities should instead be reviewed through the private nondelegation doctrine. *Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, 178 F.4th 224, 249-53 (5th Cir. 2026). Defendant makes its Appointments Clause argument in the alternative, and the Court need not address it if it dismisses Plaintiff's action on private nondelegation grounds.

because—unlike with CWA citizen suits—"the government may take complete control of the case if it wishes." *Id.* And, unlike those who are non-officers, Plaintiff does not operate in an "advisory" role and make "only non-binding recommendations." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025). Thus, the first prong is met.

The second prong also is met because Plaintiff "occup[ies] a 'continuing' position established by law." *Lucia*, 585 U.S. at 245 (citation omitted). This prong "[s]tress[es] 'ideas of tenure [and] duration'" and asks whether the putative officer's statutory duties are "'occasional or temporary' rather than 'continuing and permanent.'" *Id.* (citation omitted). This inquiry "embraces the ideas of tenure, duration, emolument, and duties" as set out in the relevant statute, *United States v. Germaine*, 99 U.S. 508, 511 (1878),[9] and the statute identifies the office's duties. *See* 33 U.S.C. § 1365(a) (ability to "commence a civil action"); *id.* § 1365(b)(1)(A) (duty to give sixty days' notice); *id.* § 1365(b)(1)(B) (ability to "intervene as a matter of right"). Also, the notion that the position is "continuing" is bolstered by the fact that, since 2010, Plaintiff has filed thirty-one CWA citizen suits in the Eastern and Middle Districts of Tennessee and Northern District of Alabama. *See* Exhibit 4, attached hereto. Essentially, it "acts as a self-appointed mini-EPA." *See Laidlaw*, 528 U.S. at 209 (Scalia, J., dissenting). This continuing nature of Plaintiff's enforcement actions further distinguishes CWA citizen suits from *Taxpayers Against Fraud*, 41 F.3d at 1041 ("Furthermore, the relator's 'position is without tenure, duration, continuing emolument, or continuous duties.'" (citation omitted)). If multiple courts have held that an individual who temporarily pursues a single case can be an officer,[10] then a litigant like Plaintiff, which regularly

[9] This Court can hold that Plaintiff occupies a continuing position even if not all "continuing position" factors are met. *Braidwood*, 606 U.S. at 755 (individuals can be officers even though "[t]hey serve on a volunteer basis" and "are not paid by the Federal Government").

[10] *Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988); *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022); *In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019).

files enforcement actions over a sixteen-year period, qualifies as an officer. And although an Appointments Clause argument was recently rejected regarding the FCA's *qui tam* provision, *Zafirov* is distinguishable because unlike FCA relators, CWA citizen plaintiffs' duties are not "personal and can[] be assumed by others." *U.S. ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 190, F.4th 1298, 1306 (11th Cir. 2026). This is underscored by the fact that Plaintiff is a nonprofit corporation; if it withdrew, the suit still could be prosecuted by one or more of its members. *See* SAC ¶¶ 11-16. Thus, the office's "duties continue, though the person" occupying it "be changed." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, C.J.).

Thus, Plaintiff "occupies a continuing position" and satisfies the second step for officer status. But it has not been appointed to its office consistent with the Appointments Clause, nor does the CWA require that it be so appointed. Therefore, § 1365 violates the Appointments Clause.

## V. CWA Citizen Suits Have No Basis in History or Tradition

Besides examining Article II's clauses to determine whether Congress violated the separation of powers, the Supreme Court considers as relevant whether a statute lacks a historical precedent. According to this criterion, courts considering constitutional challenges should view Congressional enactments with skepticism when they are "an innovation with no foothold in history or tradition." *Seila Law*, 591 U.S. at 222. "'Perhaps the most telling indication of the severe constitutional problem with [a statute] is the lack of historical precedent for'" it. *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 505 (2010) (citation omitted). Citizen suits have no foothold in history or tradition because, "until the 20th century, Congress rarely created 'citizen suit'-style causes of action for suits against private parties by private plaintiffs . . . . The situation has changed markedly, especially over the last 50 years or so." *TransUnion*, 594 U.S. at 428 n.1. Their status as "a historical anomaly" provides additional evidence as to why there are constitutional violations.

*Seila Law*, 591 U.S. at 220, 222 ("CFPB's single-Director structure" was unconstitutional because it was "almost wholly unprecedented."); *see United States v. Arthrex*, 594 U.S. 1, 21 (2021).[11]

Far from there being a tradition of private citizens exercising executive power, there has been since the Founding a tradition of the Executive pursuing public remedies to vindicate public rights and having discretion over such suits. *See supra* pp. 5-9, 14-18. This tradition was confirmed by the Supreme Court in the nineteenth century. *Martin v. Hunter's Lessee*, 14 U.S. 304, 329-30 (1816) ("The second article declares that 'the executive power *shall be vested* in a president of the United States of America.' Could congress vest it in any other person . . . ? It is apparent that such a construction . . . would be utterly inadmissible."); *Confiscation Cases*, 74 U.S. 454, 457 (1868) ("civil" suits cannot proceed "for the benefit of the United States, unless the same is represented by the district attorney, or some one designated by him"). This understanding continued into the twentieth century, *Buckley*, 424 U.S. at 139; *Printz v. United States*, 521 U.S. 898, 922-24 (1997), and remains the law today. *All. for Hippocratic Med.*, 602 U.S. at 382; *Texas*, 599 U.S. at 684; *id.* at 689 (Gorsuch, J., concurring in judgment).

Any contention that citizen suits are constitutional because they have been included in federal statutes over the last fifty-six years, must be rejected. A court's "inquiry is sharpened rather than blunted by the fact that Congressional [enactments] are appearing with increasing frequency in statutes which delegate authority to" private plaintiffs to wield executive power. *INS v. Chadha*, 462 U.S. 919, 944 (1983); *see also Slaughter*, 609 U.S. at 461; *Seila Law*, 591 U.S. at 231-32. Indeed, due to the nature of Congress's constitutional powers, it is unsurprising that it can take more than a half-century for novel Congressional enactments to be found unconstitutional.

[11] The United States agrees "citizen suits lack the historic pedigree" needed for them to be upheld. *See NAACP v. X.AI*, No. 3:26-cv-74, ECF Doc. 86 at ECF p. 28 n.5 (N.D. Miss. Jul. 7, 2026).

Because Congress's powers are "'at once more extensive and less susceptible of precise limits, it can with the greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments.'" *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 273-74 (1991) (citation omitted). Congress has encroached on the Executive Branch by creating CWA citizen suits, which have no "foothold in history or tradition," a consideration that points to a separation of powers violation.

## VI. Last Week's *X.AI* Opinion Was Wrongly Decided

Defendant anticipates that Plaintiff will rely on an opinion rejecting separation of powers arguments regarding the analogous CAA citizen suit provision. *NAACP v. X.AI Corp.*, 2026 WL 3270169, at *13-15 (N.D. Miss. Oct. 30, 2026) ("*X.AI II*"). For three reasons, *X.AI II* was wrongly decided. ***First***, to support its holding that citizen suit plaintiffs do not exercise executive power, *X.AI II* cited the proposition that Congress may "'allow[] private parties to enforce the law through civil litigation'" because "'[s]tatutory rights and obligations are established by Congress, and it is entirely appropriate for Congress . . . to determine . . . who may enforce them and in what manner.'" *Id.* at *13 (quoting *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 367 (2025); *Davis v. Passman*, 442 U.S. 228, 241 (1979)). Its reliance on these cases was misplaced, as the quotations are taken out of a quite different context—namely, when courts may infer that Congress has authorized a *private* right of action to redress *private*, not public, injuries. *See Medina*, 606 U.S. at 367-76; *Davis*, 442 U.S. at 238-41. Thus, the court ignored the "admonish[ment] that 'general language in judicial opinions' should be read 'as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.'"[12] *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278

[12] Regardless, the Supreme Court has held § 1365 does not contain an implied private cause of action. *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 18 (1981).

(2023) (citation omitted). The court also ignored that the Constitution places limits on the laws Congress may enact, as "Congress has plenary authority in all areas in which it has substantive legislative jurisdiction, *so long as the exercise of that authority does not offend some other constitutional restriction*." *Buckley*, 424 U.S. at 132 (emphasis added) (citation omitted). Section 1365 offends numerous constitutional restrictions. *See supra* pp. 5-20.

Defendant does not dispute that (subject to constitutional constraints) Congress may create a private right and then give an individual a private cause of action to seek damages. *See supra* p. 8. But this is not what Congress did through CWA citizen suits, a point that is driven home by comparing them to the citizen suits Congress created in the Surface Mining Control and Reclamation Act ("SMCRA"). Like the CWA, the SMCRA contains a citizen suit provision that allows any person—subject to a notice requirement and diligent prosecution bar—to bring suit "against any other person who is alleged to be in violation of any rule, regulation, order or permit issued pursuant to this subchapter." 30 U.S.C. § 1270(a)(l). As with § 1365, this SMCRA subsection is constitutionally suspect. However, the SMCRA departs from the CWA by also allowing "[a]ny person who is injured in his person or property through the violation by any operator of any rule, regulation, order, or permit issued pursuant to this chapter [to] bring an action for damages." *Id.* § 1270(f). Plaintiffs seeking to enforce this private right are not subject to SMCRA's notice requirement and diligent prosecution bar. *Id.* § 1270(b)(l) (clarifying its "[l]imitation on bringing of action" applies only to an action "under subsection (a)(l) of this section"). Unlike the CWA, § 1270(f) is an example of Congress properly creating a private right and allowing purportedly injured persons the ability to vindicate it through a private cause of action. *See* Harold J. Krent & Ethan G. Shenkman, *Of Citizen Suits and Citizen Sunstein*, 91 Mich. L. Rev. 1793, 1795-96 (1993). If the CWA contained a provision analogous to § 1270(f) and

Plaintiffs were suing under it, Defendant would not be advancing its arguments. But, as drafted, § 1365 is unconstitutional.

***Second***, although *X.AI II* acknowledged that "Article III standing and the exercise of executive power are separate questions," it proceeded to conflate these two concepts anyways. *See X.AI II*, 2026 WL 3270169, at *15. It did so by repeatedly claiming that "citizen suit plaintiffs sue on their own behalf." *Id.* That is only true in the sense that citizen plaintiffs must establish their own Article III standing to sue. But that requirement doesn't change the fact that, substantively, citizen plaintiffs "seek relief not on their own behalf but on behalf of society as a whole[.]" *Ellis*, 390 F.3d at 477. That citizen suits are on behalf of society is underscored by the fact that any civil penalties recovered go to the U.S. Treasury, and the existence of the notice requirement and diligent prosecution bar. If CWA citizen-plaintiffs were trying to vindicate private rights, they would not need to notify the EPA Administrator and delay bringing suit, and the Administrator would not be able to bar them from vindicating their private rights. Instead, the diligent prosecution bar operates as "a tell": potential citizen-plaintiffs need to notify the Administrator because citizen suits seek to vindicate public rights and, thus, constitute exercises of executive power. *See supra* pp. 6-9.[13]

***Third***, *X.AI II* erred by holding that CAA citizen suits brought against private parties under 42 U.S.C. § 7604(a)(1)—which mirrors 33 U.S.C. § 1365(a)(1)—do not interfere with prosecutorial discretion. *See X.AI II*, 2026 WL 3270169, at *14. To support this holding, it wrongly relied on § 7604(a)(2), which mirrors § 1365(a)(2) and allows citizen suits to compel the EPA

---

[13] Nor does a "power" cease to be "executive" because citizen suit plaintiffs sue "in their own name." *Contra X.AI II*, 2026 WL 3270169, at *15. Whether a "power" is "executive" does not turn on how a case is captioned. After all, the "'Constitution deals with substance, not shadows.'" *Trump*, 603 U.S. at 631 (citation omitted). Carried to its logical conclusion, if *X.AI II* were correct, then every private nondelegation challenge brought against private plaintiffs would fail. It is implausible the *Consumers' Research* created a test that can never be met.

Administrator to perform acts or duties which are "not discretionary."[14] But the fact that Congress, as a *statutory* matter, allowed *direct* suits against the Administrator for *only* nondiscretionary acts (and not for punitive reasons) does not change the *constitutional* analysis. The Constitution forbids Congress from doing "indirectly" what "cannot be done directly." *Students for Fair Admission, Inc. v. Pres. & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023). The Executive Vesting and Take Care Clauses forbid interference—direct or indirect—with agency enforcement discretion. *See supra* pp. 14-18. Section 1365(a)(1) citizen suits do an end-run around this prohibition by allowing private plaintiffs to bring the very enforcement claims the Executive declined to pursue. For these reasons, *X.AI II* was wrongly decided.

**<u>CONCLUSION</u>**

Although the Constitution envisions checks against the excessive application of executive power, CWA citizen suits eviscerate these checks by violating the Constitution. Any role private plaintiffs may have in the enforcement of federal environmental law is constitutionally limited to seeking private remedies for alleged private wrongs. If Congress believes under-enforcement of the CWA to be a problem, "other forums remain open for examining the Executive Branch's" purported lack of diligence. *Texas*, 599 U.S. at 685 (listing congressional "oversight, appropriations, the legislative process, and Senate confirmations" and "elections"); *cf. NRSC v. FEC*, 609 U.S. 908, 928-29 (2026) ("lack of Government . . . enforcement . . . is not an excuse for the Government . . . to turn around and enact legislation that" is unconstitutional). Because CWA citizen suits are unconstitutional, the Court should grant the motion to dismiss.[15]

---

[14] This case does not involve a § 1365(a)(2) claim, and the Motion does not challenge the constitutionality of that subsection.

[15] Independently, Count II (Injunctive Relief) "fails, because 'a request for an injunction is not a claim, but merely a remedy for a claim.'" *Tenn. Riverkeeper v. Waste Connections of Tenn., Inc.*, 769 F. Supp. 3d 784, 795 (M.D. Tenn. 2025) (citations omitted).

DATED: November 5, 2026.

Respectfully submitted,


/s/ Sean J. Radomski
Sean J. Radomski* (Pa. Bar No. 319732)
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747
sradomski@pacificlegal.org

Damien M. Schiff* (Cal. Bar No. 235101)
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
dschiff@pacificlegal.org

/s/ Matthew A. Jared
Matthew A. Jared (No. 021212)
11 North Washington Avenue
Cookeville, TN 39501
Telephone: (931) 526-9788
Facsimile: (931) 528-8163
mjared@jaredandjared.com

*Pro hac vice

*Attorneys for Defendant Town of Alexandria*


## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2026, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which is understood to have sent notification of such filing electronically to all counsel of record.

*/s/ Sean J. Radomski*
*Attorney for Defendant*