**Ex. 2 Pursuant to LCR 7.03(b)(5)**

# COMMENTARIES ON THE LAWS OF ENGLAND

BOOK IV OF PUBLIC WRONGS

WILLIAM BLACKSTONE

WITH AN INTRODUCTION, NOTES, AND TEXTUAL APPARATUS BY RUTH PALEY

OXFORD

Case 2:26-cv-00032 Document 32-2 Filed 11/05/26 Page 2 of 6 PageID #: 342

CHAPTER THE FIRST. 1

# OF THE NATURE OF CRIMES; AND THEIR PUNISHMENT.

We are now arrived at the fourth and last branch of these commentaries; which treats of *public wrongs*, or *crimes* and *misdemesnors*. For we may remember that, in the beginning of the preceding volume[a], wrongs were ⟨1⟩ divided into two sorts or species; the one *private*, and the other *public*. Private wrongs, which are frequently termed civil injuries, were the subject of that entire book: we are now therefore, lastly, to proceed to the consideration of public wrongs, or crimes and misdemesnors; with the means of their prevention and punishment. In the pursuit of which subject I shall consider, in the first place, the general nature of crimes and punishments; secondly, the persons capable of committing crimes; thirdly, their several degrees of guilt, as 2
principals or accessories; fourthly, the several species of crimes, with the punishment annexed to each by the laws of England; fifthly, the means of preventing their perpetration; and, sixthly, the method of inflicting those punishments, which the law has annexed to each several crime and misdemesnor.

First, as to the general nature of crimes and their punishment: the discussion and admeasurement of which forms in every country the code of criminal law; or, as it is more usually denominated with us in England, the doctrine of the *pleas of the crown*: so called, because the king, in whom centers the majesty of the whole community, is supposed by the law to be the person injured by every infraction of the public rights belonging to that community, and is therefore in all cases the proper prosecutor for every public offence[b].

The knowlege of this branch of jurisprudence, which teaches the nature, extent, and degrees of every crime, and adjusts to its adequate and necessary penalty, is of the utmost importance to every individual in the state. For (as a very great master of the crown law[c] has observed upon a similar occasion) no rank or elevation in life, no uprightness of heart, no prudence or circumspection of conduct, should tempt a man to conclude, that he may not at some time or other be deeply interested in these researches. The infirmities of the best among us, the vices and ungovernable passions of others, the instability of all human affairs, and the numberless unforeseen events, which the compass of a day may bring forth, will teach us (upon a moment's reflection) that to know with precision what the laws of our country have forbidden, and the deplorable consequences to which a wilful disobedience may expose us, is a matter of universal concern.

[a] Book III. ch. 1.
[b] See Vol. I. p. 268 [I. 173].
[c] Sir Michael Foster. pref. to rep. [Foster, *Crown Law*, iii.]

surely equal precaution is necessary,[2] when laws are to be established, which may affect the property, the liberty, and perhaps even the lives, of thousands. Had such a reference taken place, it is impossible that in the eighteenth century it could ever have been made a capital crime, to break down (however maliciously) the mound of a fishpond, whereby any fish shall escape; or to cut down a cherry tree in an orchard[f]. Were even a committee appointed but once in an hundred years to revise the criminal law, it could not have continued to this hour a felony without benefit of clergy,[3] to be seen for one month in the company of persons who call themselves, or are called, Egyptians[g].[4]

It is true, that these outrageous penalties, being seldom or never inflicted, are hardly known to be law by the public: but that rather aggravates the mischief, by laying a snare for the unwary. Yet they cannot but occur to the observation of any one, who hath undertaken the task of examining the great outlines of the English law, and tracing them up to their principles: and it is the duty of such a one to hint them with decency to those, 5
whose abilities and stations enable them to apply the remedy. Having therefore premised this apology for some of the ensuing remarks, which might otherwise seem to savour of arrogance, I proceed now to consider (in the first place) the general nature of *crimes*.

I. A crime, or misdemesnor, is an act committed, or omitted, in violation of a public law, either forbidding or commanding it. This general definition comprehends both crimes and misdemesnors; which, properly speaking, are mere synonymous terms: though, in common usage, the word, "crimes," is made to denote such offences as are of a deeper and more atrocious dye; while smaller faults, and omissions of less consequence, are comprized under the gentler name of "misdemesnors" only.

The distinction of public wrongs from private, of crimes and misdemesnors from civil injuries, seems principally to consist in this: that private wrongs, or civil injuries, are an infringement or privation of the civil rights which belong to individuals, considered merely as individuals; public wrongs, or crimes and misdemesnors, are a breach and violation of the public rights and duties, due to the whole community, considered as a community, in its social aggregate capacity. As if I detain a field from another man, to which the law has given him a right, this is a civil injury, and not a crime; for here only the right of an individual is concerned, and it is immaterial to the public, which of us is in possession of the land: but treason, murder, and robbery are properly ranked among crimes; since, besides the injury done to individuals, they strike at the very being of society; which cannot possibly subsist, where actions of this sort are suffered to escape with impunity.

In all cases the crime includes an injury: every public offence is also a private wrong, and somewhat more; it affects the individual, and it likewise affects the

[f] Stat. 9 Geo. I. c. 22. 31 Geo. II. c. 42.

[g] Stat. 5 Eliz. c. 20.

---

[2] Since 1706 procedure in the House of Lords (where most private bills originated) had required the judges to scrutinize and report on every such bill before it could be considered by the House.

[3] See further IV. 236–41.

[4] i.e. the Romani, those travelling people whose supposed Egyptian origins led to the term 'gypsy', now widely regarded as pejorative; see further IV. 108–9.

Case 2:26-cv-00032 Document 32-2 Filed 11/05/26 Page 4 of 6 PageID #: 344

6 community. Thus treason in imagining the king's death involves in it conspiracy against an individual, which is also a civil injury: but as this species of treason in its consequences principally tends to the dissolution of government, and the destruction thereby of the order and peace of society, this denominates it a crime of the highest magnitude. Murder is an injury to the life of an individual; but the law of society considers principally the loss which the state sustains by being deprived of a member, and the pernicious example thereby set, for others to do the like. Robbery may be considered in the same view: it is an injury to *private* property; but, were that all, a civil satisfaction in damages might atone for it: the *public* mischief is the thing, for the prevention of which our laws have made it a capital offence. In these gross and atrocious injuries the private wrong is swallowed up in the public: we seldom hear any mention made of satisfaction to the individual; the satisfaction to the community being so very great. And indeed, as the public crime is not otherwise avenged than by forfeiture of life and property, it is impossible afterwards to make any reparation for the private wrong; which can only be had from the body or goods of the aggressor. But there are crimes of an inferior nature, in which the public punishment is not so severe, but it affords room for a private compensation also: and herein the distinction of crimes from civil injuries is very apparent. For instance; in the case of battery, or beating another, the aggressor may be indicted for this at the suit of the king, for disturbing the public peace, and be punished criminally by fine and imprisonment: and the party beaten may also have his private remedy by action of trespass for the injury, which he in particular sustains, and recover a civil satisfaction in damages. So also, in case of a public nusance, as digging a ditch across a highway, this is punishable by indictment, as a common offence to the whole kingdom and all his majesty's subjects: but if any individual sustains any special damage thereby, as laming his horse, breaking his carriage, or the like, the offender
7 may be compelled to make ample satisfaction, as well for the private injury, as for the public wrong.

Upon the whole we may observe, that in taking cognizance of all wrongs, or unlawful acts, the law has a double view: *viz.* not only to redress the party injured, by either restoring to him his right, if possible; or by giving him an equivalent; the manner of doing which was the object of our enquiries in the preceding book of these commentaries: but also to secure to the public the benefit of society, by preventing or punishing every breach and violation of those laws, which the sovereign power has thought proper to establish, for the government and tranquillity of the whole. What those breaches are, and how prevented or punished, are to be considered in the present book.

II. The nature of *crimes and misdemesnors* in general being thus ascertained and distinguished, I proceed in the next place to consider the general nature of *punishments:* which are evils or ⟨2⟩ inconveniences consequent upon crimes and misdemesnors; being devised, denounced, and inflicted by human laws, in consequence of disobedience or misbehaviour in those, to regulate whose conduct such laws were respectively made. And herein we will briefly consider the *power*, the *end*, and the *measure* of human punishment.

Case 2:26-cv-00032 Document 32-2 Filed 11/05/26 Page 5 of 6 PageID #: 345

1. As to the *power* of human punishment, or the right of the temporal legislator to inflict discretionary penalties for crimes and misdemesnors[h]. It is clear, that the right of punishing crimes against the law of nature, as murder and the like, is in a state of mere nature vested in every individual. For it must be vested in somebody; otherwise the laws of nature would be vain and fruitless, if none were empowered to put them in execution: and if that power is vested in any *one*, it must also be vested in *all* mankind; since all are by nature equal. Whereof the first murderer Cain was so 8
sensible, that we find him[i] expressing his apprehensions, that *whoever* should find him would slay him.[5] In a state of society this right is transferred from individuals to the sovereign power; whereby men are prevented from being judges in their own causes, which is one of the evils that civil government was intended to remedy. Whatever power therefore individuals had of punishing offences against the law of nature, that is now vested in the magistrate alone; who bears the sword of justice by the consent of the whole community. And to this precedent natural power of individuals must be referred that right, which some have argued to belong to every state, (though, in fact, never exercised by any) of punishing not only their own subjects, but also foreign embassadors, even with death itself; in case they have offended, not indeed against the municipal laws of the country, but against the divine laws of nature, and become liable thereby to forfeit their lives for their guilt[k].

As to offences merely against the laws of society, which are only *mala prohibita* [wrong because forbidden], and not *mala in se* [intrinsically wrong]; the temporal magistrate is also empowered to inflict coercive penalties for such transgressions: and this by the consent of individuals; who, in forming societies, did either tacitly or expressly invest the sovereign power with a right of making laws, and of enforcing obedience to them when made, by exercising, upon their non-observance, severities adequate to the evil. The lawfulness therefore of punishing such criminals is founded upon this principle, that the law by which they suffer was made by their own consent; ⟨3⟩ it is part of the original contract into which they entered, when first they engaged in society; it was calculated for, and has long contributed to, their own security.

This right therefore, being thus conferred by universal consent, gives to the state exactly the same power, and no more, over all its members, as each individual member had naturally over himself or others. Which has occasioned some to doubt, 9
how far a human legislature ought to inflict capital punishments for *positive* offences; offences against the municipal law only, and not against the law of nature; since no individual has, naturally, a power of inflicting death upon himself or others for actions in themselves indifferent. With regard to offences *mala in se*, capital punishments are in some instances inflicted by the immediate *command* of God himself to all mankind; as, in the case of murder, by the precept delivered to Noah, their common ancestor and representative, "whoso sheddeth man's blood, by man

[h] See Grotius, *de j. b. & p. l.* 2. *c.* 20. Puffendorf, L. of Nat. and N. b. 8. c. 3.

[i] Gen. iv. 14.

[k] See Vol. I. pag. 254 [I. 164–5].

---

[5] A reference to the story of Cain and Abel, sons of Adam and Eve, as told in the book of Genesis 10. 1–14.

Case 2:26-cv-00032 Document 32-2 Filed 11/05/26 Page 6 of 6 PageID #: 346